_____

| | |
|---|---|
| WILLIAM HOWELL, | : |
| | : **COMPLAINT** |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. |
| | : |
| MONROE COUNTY, PATRICK O'FLYNN, | : |
| RON HARLING, CORRECTIONAL MEDICAL | : |
| CARE, INC., EMRE UMAR, MARIA CARPIO | : |
| CHRISTINE ROSS, ANSELMO DEASIS, M.D., | : **JURY TRIAL DEMANDED** |
| SHAHID ALI, N.P., BETSY TELLER, P.A., | : |
| JOHN/JANE DOES 1-3, Employees of | : |
| Correctional Medical Care, Inc., | : |
| whose identities cannot presently be determined, | : |
| | : |
| Defendants. | : |

_____

Plaintiff William Howell, by and through his attorneys, the Law Offices of Elmer Robert Keach, III, PC, complaining of Defendants, alleges as follows:

## JURISDICTION

1.      This Court has jurisdiction over this action under the provisions of 28 U.S.C. §§ 1331, 1341, & 1343 because it is filed to obtain compensatory and punitive damages for the deprivation, under the color of state law, of the rights of citizens of the United States secured by the Constitution and federal law pursuant to 42 U.S.C. § 1983.

2.      Venue is proper under 28 U.S.C. § 1391 (e)(2) because the events giving rise to the Plaintiff's claims occurred in this judicial district.

3.      This Court also has supplemental jurisdiction over claims asserted in this action under New York State Law pursuant to 28 U.S.C. § 1367. Plaintiff files with this Complaint a

Certificate of Merit pursuant to the provisions of the New York Rules of Civil Procedure § 3012-a. **See Exhibit D**.

## **PARTIES**

4.      Plaintiff William Howell is a citizen of the United States and currently resides in Rochester, New York. William Howell is not currently incarcerated.

5.      Defendant Monroe County is a municipal entity duly incorporated under the laws of the State of New York, with its principal place of business being 101 County Office Building, 39 W. Main Street, Rochester, New York.

6.      Defendant Patrick O'Flynn was and remains employed as the duly appointed Sheriff of Monroe County, with his principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

7.      Defendant Ron Harling was and remains employed as the Administrator of the Monroe County Jail, with his principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

8.      Defendant Correctional Medical Care, Inc. is a corporation duly licensed to conduct business in the State of New York, with its principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

9.      Defendant Emre Umar was and remains employed as the duly appointed President of Correctional Medical Care, Inc., with his principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

10.     Defendant Maria Carpio was and remains employed as the duly appointed Chief Executive Officer of Correctional Medical Care, Inc., with her principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

11.     At all times relevant herein, and upon information and belief, Defendant Christine Ross was employed as the head of nursing at the Monroe County Jail by Correctional Medical Care, Inc., with her principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

12.     At all times relevant herein, and upon information and belief, Defendant Anselmo Deasis was employed as the Medical Director at the Monroe County Jail by Correctional Medical Care, Inc., with his principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

13.     At all times relevant herein, and upon information and belief, Defendant Shahid Ali was employed as a nurse practitioner at the Monroe County Jail, with his principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

14.     At all times relevant herein, and upon information and belief, Defendant Betsy Teller was employed as a physician's assistant at the Monroe County Jail, with her principal place of business being 130 S. Plymouth Avenue, Rochester, New York.

15.     At all times relevant herein, and upon information and belief, Defendants John/Jane Does 1-3 were employed by Correctional Medical Care, Inc., with their principal place of business being 130 S. Plymouth Avenue, Rochester, New York. Plaintiff cannot presently determine the identities of these individuals, except to say that they were employed as nurses or other medical providers at the Monroe County Jail and were responsible to provide medical care to William Howell.

## **FACTS**

16.     On or about December 10, 2013, Plaintiff William Howell was admitted to the Monroe County Jail. Approximately two weeks after his admission, Mr. Howell began suffering from severe diarrhea, fatigue and weakness. Mr. Howell was evaluated by medical staff, and was provided large doses of what was described as "diarrhea medication". Mr. Howell later learned that he was actually receiving massive and toxic doses of the wrong medication, including an anti-psychotic medication, which caused catastrophic damage to his brain and liver.

17.     As expected, the purported "diarrhea medication" did not alleviate Mr. Howell's symptoms. In fact, his symptoms continued to worsen. Over the next five weeks, Mr. Howell's diarrhea got worse and he suffered from the additional symptoms of nausea, shaking, headaches, extreme fatigue, and weight loss. Mr. Howell repeatedly complained to medical staff about his escalating symptoms. In response, Mr. Howell was evaluated several times by the facility doctor and other medical staff including, upon information and belief, Defendants Anselmo Deasis, M.D., Shahid Ali, N.P., Betsy Teller, P.A., and Jane/John Does 1-3 (hereinafter the "Medical Defendants"). On each occasion, Mr. Howell was told that there was nothing else that the facility could do for him other than provide him with the same medication.

18.     Mr. Howell's deteriorating medical condition was obvious and known throughout the facility. In fact, numerous corrections officers attempted to relieve some of Mr. Howell's discomfort by contacting medical staff, bringing him extra toilet paper and bringing his food to his cell because Mr. Howell could not get out of bed.

19.     On or about January 16, 2014, the medical defendants abruptly discontinued almost all of Mr. Howell's medications. Upon information and belief, the Defendants discontinued Mr. Howell's medications because they finally realized they had been giving Mr.

Howell massive doses of the wrong medication. Despite this determination, Mr. Howell was not immediately sent to the hospital or provided any medical treatment or supervision. Upon information and belief, it is not only dangerous to abruptly stop a patient's medication without appropriate medical supervision, it is medically reckless and indifferent, especially if the patient is taking strong psychotropic medication.

20.     Mr. Howell experienced his last conscious day before he was hospitalized on or about January 19, 2014.  Throughout the day, Mr. Howell felt so weak he could not get out of bed, eat, and move his limbs. Mr. Howell also suffered from uncontrollable shaking, nausea and extreme sweats throughout the day. Mr. Howell thought he was going to die.

21.     On or about January 20, 2014, Mr. Howell was observed in a state of delirium. Corrections Officers observed Mr. Howell acting in an absurd manner for several hours, including chasing things in his cell that was not there. Mr. Howell was eventually transported to Strong Memorial Hospital, where it was determined that he was in critical condition.

22.     Mr. Howell has no memory of the events that occurred from January 20, 2014 until January 25, 2014. During those days, numerous tests, including blood panels, were performed, in an effort to determine what was wrong with Mr. Howell. From the day of his admission, the doctors immediately suspected that Mr. Howell was suffering from ingestion of a toxic substance. Upon information and belief, the doctors quickly ruled out illegal substances as the cause and determined that Mr. Howell likely ingested a toxic amount of prescription medication.

23.     In order to confirm their suspicion, the medical staff at Strong Memorial Hospital contacted the Monroe County Jail to determine whether Mr. Howell had been provided any medications that would cause his symptoms. Rather than admit that they had provided Mr.

Howell the wrong medications, the medical defendants, who upon information and belief, discontinued Mr. Howell's medication after discovering their error, merely provided the Hospital with a list of the medications Mr. Howell was "supposed" to be taking. As a result, the medical staff at Strong Memorial Hospital continued to struggle with diagnosing and treating Mr. Howell because they could not immediately and conclusively determined that Mr. Howell was suffering from toxic ingestion. Upon information and belief, the Defendants failure to immediately inform the hospital staff of their error prevented Mr. Howell from making a full or more substantial recovery.

24. There is no question that the Medical Defendants knew that Mr. Howell had been prescribed the wrong medication. In fact, on or about January 25, 2014, Defendant Christine Ross, the head of nursing at the Monroe County Jail, personally visited Mr. Howell in his hospital room to apologize for their mistake. Again, despite being feet away from the hospital's medical staff, Defendant Ross also failed to inform them about the cause of Mr. Howell's symptoms, thereby directly preventing Mr. Howell from receiving immediate and appropriate medical treatment for toxic ingestion.

25. Mr. Howell was eventually discharged from Strong Memorial Hospital on or about January 31, 2014. Upon information and belief, Mr. Howell was informed that his blood contained toxic amounts of anti-psychotic medication and breathing medication for approximately 30 days. Mr. Howell was informed that the combination of receiving the wrong medication and suffering from prolonged, untreated and severe diarrhea caused the ammonia levels in Mr. Howell's blood to spike to near fatal levels, causing irreversible damage to his brain and liver.

26.     Mr. Howell now suffers from permanent memory loss and confusion. Mr. Howell was also told that he will likely suffer from recurring episodes of ammonia spikes which may result in fatal consequences. Mr. Howell now lives in fear that he will soon die from this condition. This fear is well-founded given that he was subsequently hospitalized on approximately seven occasions when he experienced critical spikes in his ammonia levels. In addition to suffering permanent brain damage, Mr. Howell is also suffering from stage four liver failure, chronic pancreatitis, and may need a liver transplant in the future. Mr. Howell is also scheduled to have his gallbladder surgically removed, upon information and belief, as a result of the complications caused by the Defendants' conduct.

27.     Upon information and belief, Correctional Medical Care, Inc., through express policy, practices and/or the inactions of its policy makers, had a policy and/or practice of not providing appropriate medical care to detainees at the Monroe County Jail and many other local jails across the State of New York and the Commonwealth of Pennsylvania. This is evident given the numerous successful lawsuits and settlements that have been brought against CMC and the trail of deaths that follow whenever CMC is contracted to provide medical care for jail detainees. In fact, the Commission of Corrections has issued numerous scathing reports exposing CMC for their repeated failure to provide appropriate care to inmates including:

- Joaquin Rodriguez, Monroe County Jail – spent last five days "seriously ill … without medical care," medical care represented "gross negligence and gross incompetence."

- Kevin Schmitt, Ulster County Jail – death by suicide. The Commission required the Ulster County sheriff to conduct an immediate review of the care provided by CMC, and recommended that they terminate their contract with CMC if they delayed making and/or refused to make any of the recommendations made by the Commission. The Commission also requested that the Office of Professions inquire into whether CMC, a corporation, was lawfully practicing medicine in New York.

- <u>John Wright, Onondaga County Justice Center</u> – death by morphine overdose. The Commission required CMC to "conduct a comprehensive inquiry into the grossly incompetent and inadequate care rendered to John Wright."

- <u>Maria Viera, Monroe County Jail</u> – "inappropriate and inadequate credentialing." Use of improperly trained and inexperienced nurse to perform initial assessment of detainee, detainee later dies of drug withdrawal.

- <u>Richard Vandermark, Ulster County Jail</u> – "failure to provide a timely mental health assessment."

- <u>Alvin Rios, Broome County Jail</u> – Required Broome County Executive to "conduct an inquiry into the fitness of Correctional Medical Care, Inc. as a correctional medical care provider, specifically for its failure to implement ... policy and procedure...".

- <u>Justin McCue, Dutchess County Jail</u> – inmate committed suicide by hanging as a result of inadequate policies and procedures.

- <u>Robert Barksdale, Monroe County Jail</u> – inmate committed suicide by hanging. The Commission required CMC to ensure that their staff are properly trained and follow their own policies and procedures.

- <u>Dylan Burke, Oneida County Jail</u> – death caused by inadequate detoxification treatment. The Commission instructed CMC to "cease treating opiate/narcotic withdrawal symptomatically with palliative medications which do not provide effective detoxification."

- <u>Thomas Siewert, Dutchess County Jail</u> – inmate committed suicide by hanging. The Commission recommended "In light of the fundamental and egregious lapse of care in this case, the Sheriff, in conjunction with the Executive, shall review the status of CMC, Inc. with respect to its capabilities as a medical, and in particular, a mental health service provider."

28.     This is but a sampling of the parade of horribles wrought on helpless detainees by Correctional Medical Care, as summarized in a recent article in the Albany Times Union. See Alysia Santo, Inmates Die in Cost Cut: State Investigators Cite a Pattern of Inadequate Health Care Provided by For-Profit Companies at Jails, Albany Times Union, Monday, April 1, 2013. See **Exhibit A**. Correctional medical Care has been sued successfully on countless occasions, both in New York and Pennsylvania regarding the deaths and serious injuries suffered by other

detainees. The Commission of Correction was so concerned about the performance of CMC that it recommended to several counties that they terminate their contract, and further requested that the New York State Department of Education, Office of the Professions, take action against the company.

29.     This pattern was recently confirmed by the New York State Office of the Attorney General, who investigated CMC and required the company to sign a consent decree that made a number of damning admissions. A copy of the settlement agreement between CMC and the Attorney General's office is attached hereto as **Exhibit B**.

30.     In his press release describing the settlement, Attorney General Schneiderman detailed that CMC's actions represented "substandard care and mismanagement," and that CMC was "shortchanging medical services" for detainees. **See Exhibit C**.

31.     The settlement agreement further found that CMC employed "unlicensed and inexperienced staff; inadequate staffing; lack of adequate medical oversight; and failure to adhere to medical and administrative protocols and procedures" at CMC facilities. Settlement Agreement, p. 5 ¶11.

32.     The settlement agreement also addressed CMC's failure to pay penalties imposed against them regarding their failure to staff the Monroe County Jail with appropriately qualified medical professionals. Settlement Agreement, p. 5 ¶21-28. The settlement agreement found that when the penalties were paid, they were paid to the office of the Monroe County Sheriff instead of the County Executive. Settlement Agreement, p. 5 ¶29. It goes without saying that receiving campaign contributions from a private jail medical provider gives a clear financial incentive for the County Defendants to look the other way while inmates die and suffer egregious injuries at the Monroe County Jail.

33.     The Attorney General's Office, after conducting a review of 20 medical records at the Tioga County Jail, also found that CMC staff did not "make necessary referrals to a psychiatrist or physician" and that "not one of the medical records showed evidence of a physician ... oversight, and that staff dispensed medications in the absence of medical orders." Settlement Agreement, p. 5 ¶10. Plaintiff believes that this is exactly what happened in this case, given the decedent was not provided any meaningful medical treatment, and was likely not sent to the hospital until he was already critically ill.

34.     The Plaintiff affirmatively alleges that Correctional Medical Care, because of the financial incentives in its contracts, has a pattern and practice of failing to provide adequate medical care to detainees, including providing adequate and appropriately trained medical staff. CMC's continuing problems as a medical provider are evidence of a company who is taking taxpayers money to provide a service, and then defrauding taxpayers for the financial benefit of Defendants Emre Umar and Maria Caprio, the owners of CMC, who clearly could care less about the wellbeing of those for whom they paid to provide.

35.     During all times mentioned in this Complaint, the Defendants were acting under color of state law, that is, under color of the Constitution, statutes, laws, charter, ordinances, rules, regulations, customs, and usages of the State of New York, Monroe County, and Correctional Medical Care, Inc.

36.     Correctional Medical Care, and their employees were also operating under color of state law, in that these defendants are performing a function traditionally reserved for state and/or municipal agencies, and as such are equally responsible for the violation of civil rights as if they were state actors.

37. The Defendants, at all times mentioned in the Complaint, either knew or should have known that their actions violated clearly established law protecting the Constitutional and statutory rights of the Plaintiff.

38. Defendants knew or should have known that their actions violated clearly established law protecting the Constitutional and statutory rights of William Howell.


## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS CORRECTIONAL MEDICAL CARE, INC., CHRISTINE ROSS, ANSELMO DEASIS, SHAHID ALI, BETSY TELLER, AND JOHN/JANE DOES 1-3

#### Violation of Constitutional Rights under Color of State Law
-- Deliberate Indifference to Serious Medical Needs --

39. Plaintiff incorporates by reference and realleges each and every allegation stated herein.

40. Under the Eighth Amendment to the United States Constitution, detainees held by government agencies have a right to be free from cruel and unusual punishment. Actions of government officials or other state actors demonstrating deliberate indifference to the serious medical needs of detainees represent cruel and unusual punishment.

41. Defendants' actions, detailed above, violated William Howell's rights under the United States Constitution. Specifically, it was not objectively reasonable for the Defendants to ignore William Howell's serious medical problems, including prolonged and severe diarrhea, the administration of toxic doses of the wrong medication, and the failure to provide appropriate medical treatment once their negligence was discovered. In fact, the Defendants' actions demonstrate a deliberate indifference to Mr. Howell's serious medical needs.

42.     All of the individual Defendants were acting in their capacity either as policy makers and/or medical staff of the Monroe County Jail and therefore acted under color of state law. Their actions and inactions also represent a violation of 42 U.S.C. § 1983.

43.     Given that Correctional Medical Care, Inc. is fulfilling a traditional governmental function, but is a private profit making company, it is not entitled to the protections afforded to municipal defendants. Instead, it is vicariously liable for the deliberately indifferent actions and inactions of its employees.

44.     As a direct and proximate result of the unconstitutional acts described above, William Howell has suffered irreparable and life-changing injuries.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, ANSELMO DEASIS, CHRISTINE ROSS, MONROE COUNTY, PATRICK O'FLYNN, AND RON HARLING**

**Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights/ Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and/or Failure to Train and Supervise Employees under Color of State Law**

45.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

46.     Upon information and belief, Defendants Monroe County, Correctional Medical Care, Inc., Emre Umar, Maria Carpio, Christine Ross, and Anselmo Deasis, are responsible for establishing policies and procedures to be utilized by CMC employees, and the employees of the Monroe County Jail. Defendants Monroe County, Patrick O'Flynn, and Ron Harling are also directly responsible for the policies of Correctional Medical Care, Inc., as the responsibility for the healthcare of detainees cannot be delegated.

47.	Upon information and belief, these defendants knew or should have known that detainees in the jail were not receiving appropriate medical treatment. This is evident given the publicity surrounding deaths and injuries at Monroe County Jail and other CMC facilities. It is well established that county jails must have appropriate policies in place to ensure that detainees receive treatment for serious medical needs, and county governments will not be relieved of that responsibility by hiring private medical contractors to fulfill those duties. It is also clear that Monroe County and CMC did not have adequate policies and procedures in place given the heartless manner in which William Howell was treated while at the Monroe County Jail.

48.	These practices were particularly pronounced and known to the administrators of Correctional Medical Care, including Emre Umar and Maria Carpio. CMC has a long pattern and practice of failing to provide adequate medical care to detainees which has led to the deaths of numerous inmates. This is also evident given CMC employees were given a direct financial incentive to provide inadequate medical treatment to detainees through bonuses and by threat of termination. The response from CMC is to do nothing, including failing to provide adequate training and supervision to its subordinates to avoid the continuing and unnecessary injuries and deaths of detainees.

49.	Correctional Medical Care and its employees were also operating under color of state law, in that Correctional Medical Care is performing a function traditionally reserved for state and/or municipal agencies, and as such is equally responsible for the violation of civil rights as if it were a state actor.

50.	As such, the above-listed Defendants are directly responsible for this constitutional violation.

51.     In the alternative, Defendants have instituted appropriate polices, but then through gross negligence and carelessness have demonstrated deliberate indifference to the constitutional rights of citizens by failing or intentionally refusing to enforce them.

52.     These policies, procedures, and practices of the above-named Defendants violated the rights of Plaintiff William Howell.

53.     As a direct and proximate result of the unconstitutional acts described above, William Howell has suffered irreparable and life-changing injuries.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, CHRISTINE ROSS AND ANSELMO DEASIS

### Violation of State Law – Negligent Supervision/Retention of Employee

54.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

55.     The actions and inactions of the above named Defendants constitute the negligent supervision and/or retention of employees under New York law. Specifically, the above named defendants were responsible for supervising and/or disciplining their employees and/or agents, and failed in that duty given the allegations made herein.

56.     As a direct and proximate result of the unconstitutional acts described above, William Howell has suffered irreparable and life-changing injuries.

**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, CHRISTINE ROSS, ANSELMO DEASIS, SHAHID ALI, BETSY TELLER, AND JOHN/JANE DOES 1-3**

### Violation of State Law –Negligence/Medical Indifference

57.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

58.     The actions and inactions of the above named Defendants constitute negligence under the laws of New York. Specifically, the above named defendants were responsible for but failed to provide Plaintiff with adequate medical treatment. Specifically, it was not objectively reasonable for the Defendants, who were repeatedly informed that Plaintiff was experiencing serious medical symptoms, to ignore and/or refuse to provide Mr. Howell medical treatment.

59.     At all relevant times, Defendants Correctional Medical Care, Emre Umar and Maria Carpio employed the above-listed Defendants and as such, are vicariously liable for the actions and inactions of their agents.

60.     As a direct and proximate result of the acts described above, Plaintiff has been irreparably injured.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, CHRISTINE ROSS, ANSELMO DEASIS, SHAHID ALI, BETSY TELLER, AND JOHN/JANE DOES 1-3**

### Violation of State Law – Medical Malpractice

61.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

62.     The actions and inactions of the above named Defendants constitute medical malpractice under the laws of New York. Specifically, the above named defendants were responsible for but failed to provide Plaintiff with adequate medical treatment. Specifically, it

was not medically justifiable for the Defendants to provide Plaintiff with toxic doses of the wrong medication and thereafter fail to inform Plaintiff's subsequent medical providers of their mistake.

63.     At all relevant times, Defendants Correctional Medical Care, Emre Umar, Maria Carpio employed the above-listed Defendants and as such, are vicariously liable for the actions and inactions of their agents.

64.     Plaintiff files with this Complaint a Certificate of Merit pursuant to the provisions of the New York Rules of Civil Procedure § 3012-a. **Exhibit D**.

65.     As a direct and proximate result of the acts described above, Plaintiff has been irreparably injured.


## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, CHRISTINE ROSS, ANSELMO DEASIS, SHAHID ALI, BETSY TELLER, AND JOHN/JANE DOES 1-3

### Violation of State Law –Negligent Infliction of Emotional Distress

66.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

67.     The actions and inactions of the above named Defendants constitutes negligent infliction of emotional distress under New York law. Specifically, Defendants Christine Ross, Anselmo Deasis, Shahid Ali, Betsy Teller and John/Jane Does 1-3, by providing Plaintiff with toxic doses of the wrong medication and thereafter failing to inform Plaintiff's subsequent medical providers of their mistake, caused Plaintiff irreparable emotional injuries.

68.     At all relevant times, Defendants Correctional Medical Care, Emre Umar, Maria Carpio employed the above-listed Defendants and as such, are vicariously liable for the actions and inactions of their agents.

69.     As a direct and proximate result of the acts described above, the Plaintiff has been irreparably injured.

### AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, CHRISTINE ROSS, ANSELMO DEASIS, SHAHID ALI, BETSY TELLER, AND JOHN/JANE DOES 1-3

#### Violation of State Law – Res Ipsa Loquitur

70.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

71.     The actions and inactions of the above named Defendants constitute Res Ipsa Loquitur under New York law. Specifically, Defendants Christine Ross, Anselmo Deasis, Shahid Ali, Betsy Teller and John/Jane Does 1-3, by providing Plaintiff with toxic doses of the wrong medication Res Ipsa Loquitur caused the Plaintiff's injuries.

72.     At all relevant times, Defendants Correctional Medical Care, Emre Umar, and Maria Carpio employed the above-listed Defendants and as such, are vicariously liable for the actions and inactions of their agents.

73.     As a direct and proximate result of the acts described above, the Plaintiff has been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

74.     The actions of the Defendants Correctional Medical Care, Inc., Emre Umar, Maria Carpio, Christine Ross, Anselmo Deasis, Shahid Ali, Betsy Teller, and John/Jane Does 1-3, described above were extreme and outrageous, and shock the conscience of a reasonable person. Therefore, an award of punitive damages is appropriate to punish the Defendants for their cruel and uncivilized conduct. The Plaintiff does not seek punitive damages against Monroe County, Sheriff O'Flynn or Jail Administrator Harling.


## DEMAND FOR TRIAL BY JURY

75.     The Plaintiff hereby respectfully requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff William Howell requests that this Honorable Court grant him the following relief:

A.     A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B.     A judgment in favor of Plaintiff against all defendants, with the exception of Monroe County, Patrick O'Flynn, and Ron Harling, for punitive damages in an amount to be determined by a properly charged jury;

C.     A monetary award for attorneys' fees and the costs of this action, pursuant to 42 U.S.C. § 1988;

D.     Any other relief that this Court finds to be just, proper and equitable.

Respectfully Submitted By:

/s Elmer Robert Keach, III

Dated: February 26, 2016

_____
Elmer Robert Keach, III, Esquire
LAW OFFICES OF ELMER ROBERT
KEACH, III, PC
One Pine West Plaza, Suite 109
Albany, NY  12205
Telephone: 518.434.1718
Telecopier: 518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com

**ATTORNEY FOR PLAINTIFF
WILLIAM HOWELL**

# EXHIBIT A

## Inmates die in cost cut

**State investigators cite a pattern of inadequate health care provided by for-profit companies at jails**

By Alysia Santo

Updated 7:21 am, Monday, April 1, 2013

*For more information about the cases, see: http://blog.timesunion.com/crime/documents-inmate-death-reports/13437/*

Three months in the Monroe County Jail turned into a death sentence for Joaquin Rodriguez, a diabetic.

He spent his final five days "seriously ill ... without medical care," despite the presence of Correctional Medical Care Inc., a for-profit company hired to provide health services to inmates at the Rochester jail.

The company has lucrative contracts at the county jails in Albany, Schenectady and Rensselaer counties and other facilities across New York.

CMC's care was "characterized by gross negligence and gross incompetence," wrote state investigators.

What happened to Rodriguez is part of a pattern. A Times Union review of reports from the medical review board of New York's Commission of Correction, which investigates inmate deaths, revealed repeated instances of inadequate care from CMC and other private prison health care businesses that currently operate in the state, or once did.

The commission has been sounding alarms about such companies — since at least 2001 — via its inmate death reports.

The corporate practice of medicine is illegal in New York. Medical companies must be owned and controlled by doctors, a regulation meant to keep business considerations from influencing medical decisions.

Yet for-profit medical companies have managed to not only exist in jail infirmaries, but thrive, by setting up "professional corporations," business entities run by medical professionals and positioned legally between the company and jails they serve.

This set up is a "front operation" and is "really just an arm of the business" said Assemblyman Richard Gottfried, chair of the Assembly Health Committee since 1987.

"The arrangement here seems to be a shell game that the law should not tolerate," Gottfried said.

It's an issue the state's corrections oversight commission raised in 2004, along with the state Education Department, when both agencies urged then-Attorney General Eliot Spitzer to stop a different company, Prison Health Services, from operating in New York, but his office declined to take any action.

Now the commission is raising the same concerns about CMC, and it's not just corporate legal procedure that's of concern.

In deaths across the state, investigators have discovered the same problems with corporate-run jail health care: Underqualified staff, ignored policies, unread patient records, and a lack of discipline for employee misconduct.

The dangers of for-profit health care "are especially serious behind bars" said Gottfried, since "there is little or no oversight" and "inmates are hardly a population that has a real voice."

As mistakes and misconduct repeat, inmates have continued to die unnecessarily.

The commission uncovered flawed care in the cases of every one of the 26 inmates whose death or suicide occurred under a private company's watch and spurred an investigation over the last five years of reports.

The medical review board does not do an in-depth investigation into every inmate death, but it does look at all suicides as well as deaths that happen subsequent to use of force, where there is evidence of neglect or medical mistakes, accidents, and whenever else there is doubt over cause or circumstance.

Nine of the reviewed deaths occurred among seven different jails with CMC contracts between 2009 and 2011.

At the conclusion of three death reports involving CMC, the commission recommended the state Education Department's Office of Professions, which oversees individual and business licenses, "inquire into whether CMC, Inc., a general business corporation, may lawfully hold itself out as a medical provider."

It's the same concern the commission warned the state Education Department about regarding PHS over a decade earlier.

At that time, the state Education Department requested the attorney general begin a criminal action against PHS, but the licensing agency's stance has since changed. Spokesperson Tom Dunn wrote in an email that PHS is now operating legally because "PHS no longer directly provides medical services to jails" but rather uses a professional medical corporation for health services, and "only contracts with Prison Health Services for non-medical services, such as management and billing."

Education Commissioner John King declined an interview request.

Dunn would not answer any questions about CMC's license "because professional discipline investigations are confidential." He said "the state Education Department Office of Professions continues to work closely with the attorney general and when final agency actions have been taken they will be reported publicly."

The Commission of Correction also declined an interview request, but noted that their "concerns about whether contracted medical providers can legally operate in New York state have been well documented in the [death] reports," which, spokesperson Janine Kava wrote in an email, "speak for themselves."

CMC President Emre Umar wrote in an email that the company "offers its clients the highest level of professionalism, dedication and integrity" and "works diligently to implement all suggestions" made by the commission's medical review board. He noted that all CMC facilities "that have sought accreditation either from the National Commission on Correctional Health Care or the New York State Sheriff's Association, have achieved and maintained that accreditation."

Despite the disturbing history, services offered by these companies are an attractive sell for local governments looking to relieve themselves of the costly and chaotic responsibility of tending to medical and mental health needs of inmates.

Companies pitch themselves as experienced outfits that can recruit medical staff, maintain standards, and combat lawsuits, all for a set price.

They also donate money toward sheriff's elections.

CMC has contributed a total of $21,000 to the campaigns of sheriffs in seven New York counties, and was a top contributor in the elections of both Albany County Sheriff Craig Apple, giving $4,100, and Rensselaer County Sheriff Jack Mahar, giving $3,000. Both sheriffs said vendors often donate and this had nothing to do with their decision to hire the company.

CMC's business is flourishing in New York, where it operates exclusively, although its headquarters are in Pennsylvania.

For the many jails that have come to rely on these companies, the revolving corporate door keeps turning.

CMC has accumulated many of its contracts with jails that had previously hired other companies. There are 16 county jails in New York that use contracted providers for medical or mental health services, leaving out New York City, and 13 of those are with CMC.

The most recent CMC client is the Rensselaer County Jail, which hired the firm for the jail's first privatization of health services this March for a little under $2 million per year for three years.

Albany and Schenectady county jails both have multimillion-dollar contracts with CMC. Previously, Albany did business with similarly named Correctional Medical Services, and before that, both Schenectady and Albany were with PHS, as were other county jails.

Rensselaer County Sheriff Mahar said he asked other sheriffs about the company and "did not get one negative comment." He said he'd never heard about the commission's concerns about CMC. "Would it have changed our minds? I don't know."

That's because providing this service through the county was becoming exceedingly difficult, and local leaders saw privatization as a possible solution, Mahar said.

Schenectady County Attorney Chris Gardner described CMC as "the best company we've ever worked with."

Albany County Sheriff Craig Apple said he's "very comfortable" with CMC, and said they recently honored the company at a reception after they helped save two people's lives at the jail last year. "That's the kind of stuff you don't hear about," Apple said.

Caring for inmates is tough; they are sicker and more dependent on drugs and alcohol than the general population, said Gloria Cooper, the health services administrator for CMC at the Albany County jail. She has worked in the facility since 2000, both under PHS and CMS.

When asked about the reports on flawed medical care at other jails, she said, "I think in a lot of places, it depends on who's working."

At the Broome County Jail, one former social worker, Kim McAndrew, says she spoke out about the company's treatment of inmates and employees, and lost her job for it.

She's filed a notice of claim against the county which alleges she was "forced to see 19 to 25" inmates on a regular basis, even though she could only reasonably manage seven or eight; that she and other non-medical staff kept track of inmates medications; and that CMC hired a mental health employee into the Broome County Jail that was unlicensed and had been terminated from Tioga County following an inmate suicide.

In an interview, McAndrew said she decided to speak out because she felt she could no longer "stand by and watch."

"I didn't feel good about myself anymore," said McAndrew.

McAndrew is being represented by Binghamton attorney Ronald Benjamin, who is also in the middle of litigation for the family of Alvin Rios, a husband and father of five who died in the Broome County Jail.

"He was a beautiful man with a heart of gold," said his widow, Mildred Rios, choking back tears. "He loved his kids."

Commission investigators found that the jail knew Rios was addicted to heroin, yet CMC failed to comply with its own intoxication and withdrawal policy.

A doctor later told investigators he "never touched the chart."

*asanto@timesunion.com •518-454-5008 • @alysiasanto*

**Read the full state reports on CMC and other companies in digital versions of this story.**

### Deaths on Correctional Medical Care's watch

Richard Vandemark, 21, suicide, April 8, 2009, Ulster County Jail, "failure to provide a timely mental health assessment"

Kevin Schmitt, 50, suicide, Sept. 4 2009, Ulster County Jail, "assessment ... grossly incompetent, flagrantly substandard"

Joaquin Rodriguez, 60, diabetic ketoacidosis/pneumonia, Oct. 18, 2009, Monroe County Jail, "seek to terminate ... contract with [CMC] for cause."

Maria Viera, 53, myocarditis, Sept. 2, 2010, Monroe County Jail, "inadequate and inappropriate credentialing"

Justin McCue, 26, suicide, Sept. 23, 2010, Dutchess County Jail, "improper and inadequate mental health care and treatment"

Latisha Mason, 28, undetermined, Feb. 2, 2011, Schenectady County Jail, "failed to comport with their own policy"

Thomas Siewert, 51, suicide, Feb. 11, 2011, Dutchess County Jail, "egregious lapses of care"

Alvin Rios, 40, cardiac arrhythmia, July 20, 2011, Broome County Jail, "left ... in an emergent, life-threatening status without appropriate medical attention"

Frederick Haag, 41, suicide, Oct. 24, 2011, Tioga County Jail, "grossly inadequate mental health care"

*Source: Commission of Correction*

### Repeated warnings

Records show the commission recommended the state Education Department investigate CMC three times between 2011 and 2012

"That the Office of Professions undertake an inquiry into the status of Correctional Medical Care, Inc., a Pennsylvania corporation, as a lawful medical practitioner in New York State" March 3, 2011 (from Kevin Schmitt report)

"undertake an inquiry into the status of [CMC] ... as a lawful medical practitioner ... operating in accordance with Education Law" March 18, 2011 (from Joaquin Rodriguez report)

"inquire into whether CMC, Inc., a general business corporation, may lawfully hold itself out as a medical care provider" June 19, 2012 (from Thomas Siewert report)

*Source: Commission of Correction*

For more information about the cases, see: http://blog.timesunion.com/crime/documents-inmate-death-reports/13437/

# EXHIBIT B

ATTORNEY GENERAL OF THE STATE OF NEW YORK

In the Matter of

**CORRECTIONAL MEDICAL CARE, INC.**

**Assurance No.: 13-495**

### ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW
### SECTION 63, SUBDIVISION 15

Pursuant to the provisions of the New York State Executive Law ("EL") §§ 63(12) and 63-c; Business Corporation Law ("BCL") § 1503, Partnership Law ("PL") § 2 & 8-B, Education Law ("Educ. L") § 6512,General Business Law ("GBL") § 349, and State Finance Law § 189 (1)(a) and (b), (3), and §190 (1) ("NY False Claims Act"), Eric T. Schneiderman, Attorney General of the State of New York, caused an inquiry to be made into certain business practices of Correctional Medical Care, Inc. ("CMC"), relating to its delivery of health care services to inmates in county jails and correctional facilities in New York State. Based upon that inquiry, the Office of the Attorney General ("OAG") has made the following findings, and CMC has agreed to modify its practices and assure compliance with the following provisions of this Assurance of Discontinuance ("Assurance").

## I. BACKGROUND

1.      CMC is a for-profit business incorporated in Pennsylvania that is owned by Maria Carpio, who is not a licensed medical professional. Emre Umar, Ms. Carpio's spouse, is the President of CMC. Mr. Umar is likewise not a licensed medical professional.

2.     CMC's principal offices are located at 920 Harvest Drive, Suite 120 Blue Bell, Pennsylvania, 19422.

3.     CMC contracts with 13 upstate counties including Albany, Broome, Dutchess, Monroe, Oneida, Ontario, Orange, Putnam, Rensselaer, Schenectady, Tioga, Ulster and Warren (the "New York Counties") to deliver health services in their respective jails. CMC is responsible for delivering health services to an average daily population of 5,580 inmates, overall.[1]  In 2013, CMC was contracted to receive over $32,000,000 from these 13 counties.

4.     In the regular course of business, CMC employs and contracts with various medical and allied professionals who deliver health services at the upstate county jails including medical doctors, psychiatrists, dentists, social workers, physicians assistants, nurse practitioners, registered nurses and licensed practical nurses.

5.     New York law prohibits the corporate practice of medicine in the State. Individuals licensed by the New York State Education Department ("SED") to practice medicine may, however, practice as a professional partnership, a professional service corporation, a professional service limited liability company or registered limited liability company.

6.     The New York State Commission of Correction's Medical Review Board ("State Medical Review Board") is charged with the oversight of jail and prison health care and the investigation of related morbidity and mortality incidents.  The State Medical Review Board and the SED reported to the New York State Attorney General's

---

[1] CMC's contract with Onondaga County began in November 2010 and ended in November 2013.  Under its former contract with Onondaga County, CMC provided health services to an average daily jail population of 1,150 inmates.

Office that the increased involvement of general business corporations, such as CMC, in providing medical, dental and mental health services to inmates in county jails and correctional facilities in New York has led to unacceptable consequences at many of those facilities.

7. From 2009 to 2012, six deaths occurred at five county jails contracting with CMC for provision of health services. The State Medical Review Board's investigations of these deaths, including two deaths in Monroe and one death in Tioga counties,[2,3,4] revealed that that there were egregious lapses in medical care with respect to each of the deaths. The deaths in Monroe County took place on October 18, 2009 (due to untreated diabetes mellitus)[5] and on September 2, 2010 (death related to myocarditis and inadequate detoxification monitoring by CMC).[6] The death in Tioga County took place on October 24, 2011 (suicide by hanging following CMC's failure to provide appropriate medical and mental health care; mental health care provided by an unlicensed provider).[7]

8. Each of the State Medical Review Board's mortality reports included recommendations that were specifically addressed to each of the county sheriff's office,

---

[2] See Matter of Rios (N.Y. St. Comm'n. of Corr., September 18, 2012) (Broome County, July 20, 2011, cardiomyopathy due to heroin withdrawal where individual was a known heroin abuser and was inadequately monitored by CMC staff for signs of withdrawal).

[3] See Matter of Siewert (N.Y. St. Comm'n. of Corr., June 19, 2012) (Dutchess County, February 11, 2011, suicide by hanging following inadequate mental health assessment and treatment by CMC on admission to jail).

[4] See Matter of Schmitt (N.Y. St. Comm'n. of Corr., March 18, 2011) (Ulster County, September 1, 2009, inmate jumped to his death; CMC failed to properly assess suicidal risk on jail admission).

[5] See Matter of Rodriguez (N.Y. St. Comm'n. of Corr., March 18, 2011).

[6] See Matter of Viera (N.Y. St. Comm'n. of Corr., December 20, 2011).

[7] See Matter of Haag, at 10 (N.Y. St. Comm'n. of Corr., December 18, 2012).

CMC, SED and in some reports, to the county executive and/or the district attorney. The State Medical Review Board's recommendations included directives like the following:

- "[S]heriff's office should direct CMC to review the conduct of its mental health provider;"[8]

- "CMC should conduct a quality assurance review with all mental health staff;"[9]

- "SED should investigate the status of CMC as a corporate provider of medical services;"[10]

- "County Executive should conduct inquiry as to fitness of CMC to provide medical services;"[11]

- "Sheriff shall recruit and hire a contract monitor;"[12] and

- "[D]istrict attorney should conduct a criminal investigation into the professional activities of an unlicensed mental health provider."[13]

9.      The State Medical Review Board also reported that beginning on April 17, 2012, an inmate in the Onondaga jail suffered life-threatening systemic infections and required hospitalization for 44 days due to CMC's failure to provide adequate dental and medical attention.[14]

10.      In addition to its investigation of the death at Tioga County, the State Medical Review Board reviewed 20 medical records during a site visit at the Tioga jail

---

[8] See Matter of Schmitt, at 8 (N.Y. St. Comm'n. of Corr., March 18, 2011).

[9] See Matter of Siewert, at 7 (N.Y. St. Comm'n. of Corr., June 19, 2012).]

[10] See Matter of Rodriguez, at 8 (N.Y. St. Comm'n. of Corr., March 18, 2011).

[11] See Matter of Rios, at 6 (N.Y. St. Comm'n. of Corr., September 18, 2012).

[12] See Matter of Haag, at 8 (N.Y. St. Comm'n. of Corr., December 18, 2012).

[13] Id. at 10.

[14] See Matter of Quackenbush (N.Y. St. Comm'n of Corr., December 18, 2012).

on August 9, 2012 and found that CMC staff did not include in the medical records (i) required admission histories and physical examinations; (ii) medical orders; or (iii) completed mental health assessments, nor did CMC staff make necessary referrals to a psychiatrist or physician for those inmates who exhibited symptoms of mental distress. Further, the State Medical Review Board found that not one of the medical records showed evidence of physician or psychiatrist oversight, and that staff dispensed medications in the absence of medical orders.[15]

11.     In summary, the State Medical Review Board's investigations revealed serious deficiencies and illegalities including, but not limited to, the following: unlicensed and inexperienced staff; inadequate staffing; lack of adequate medical oversight; and failure to adhere to medical and administrative protocols and procedures.

## II. THE OAG'S INVESTIGATION AND FINDINGS

12.     The State Medical Review Board and SED requested that the OAG investigate CMC's conduct in the provision of health services in New York State county jails, alleging that CMC, a private for-profit corporation, was illegally engaging in the practice of medicine to the detriment of the health of detainees and in violation of New York law.

13.     The OAG examined CMC's corporate structure, together with its performance pursuant to its contracts with both small and large county jail systems, Tioga and Monroe Counties, respectively. Such examination included CMC's contracts, time records, staffing credentials, policies and procedures.

**Monroe County: Contract with CMC**

---

[15] See N.Y. St. Comm'n. of Corr. Report Re: Onondaga and Tioga County Site Visits (September 19, 2012).

14.    In April 2008, after a request for proposal yielded four proposals, Monroe County, through the offices of its County Executive and Sheriff, entered into a three-year contract with CMC for the provision of health services at its jail and correctional facility ("Monroe Jail/Facility") with an option to renew annually for up to five years following re-negotiation.

15.    The CMC contract price is based on an average daily inmate population of 1,475 at the Monroe Jail/Facility and allows for nominal per inmate increases for census above 1,475.

16.    The initial base contract price for the three-year period, April 1, 2008 through March 31, 2011, was projected at $24,223,146 (with annual negotiation following review of services performed in the prior year) and provided for a staff of over 55 full-time equivalents, including an overall Health Services Administrator, a Medical Director, a Physician (part-time), a Mental Health Director, and a Psychiatrist (part-time).

17.    The contract requires CMC to, *inter alia,* establish credentialing procedures for professional staff; recruit, interview and hire candidates with current licenses and certifications who have the requisite expertise, among other qualifications; provide medical, mental health, dental and pharmacy services; establish quality improvement and utilization review committees; maintain an inmate grievance and complaint policy; and conduct monthly staff meetings.

18.    The contract also sets forth that CMC is to issue Monroe County a monthly credit for "[s]taffing [s]hortage [p]enalties . . . consisting of an hourly salary and

fringe benefits for hours of each position not covered or vacant."[16]

19.     Despite two deaths at the Monroe County Jail in 2009 and 2010, that were found by the State Medical Review Board to have occurred in association with inadequate medical care, in 2011, Monroe County authorized a two-year extension of the CMC contract, not to exceed $18,996,851, with an option to renew for three additional one-year periods (the "Amended Contract").

20.     In 2013, the Monroe County Executive and Sheriff renewed the contract with CMC for an additional year, from April 1, 2013 through March 31, 2014, in an amount not to exceed $9,273,717.[17]

21.     Over the course of CMC's contractual relationship with Monroe County, it entered into a series of "Memoranda of Understanding" ("MOUs") with the office of the Monroe County Sheriff in July 2009, June 2012, October 2012 and March 2013. Such MOUs typically modified staffing matrices in a downward direction, *with no corresponding decrease in contract costs.* For example, the June 2012 MOU reduced the day shift psychiatric registered nurse hours from 172 (under the Amended Contract) to 120 hours and eliminated the 40-hour psychiatric registered nurse on the evening shift.

22.     The price of CMC's contract with Monroe County continued to increase from the initial 2008 contract through the 2013 contract period while hours for the medical director/physician, dentist and psychiatric registered nurse were respectively reduced by 23%, 42% and 43%. Over the same period, CMC increased the hours of

---

[16]  Monroe County Request For Proposals, November 9, 2007, para 2.3.21, at 47, (incorporated by reference in Health Services Agreement, April 1, 2008, Monroe County - CMC).

[17]  CMC's contract with Monroe County has not been renewed. Since April 1, 2014, CMC has been services in Monroe County on a month-to-month basis.

lower wage staff, e.g. registered nurses, licensed practical nurses and social worker/counselors by 15%, 61% and 58%, respectively.

23. Pursuant to an MOU dated July 27, 2009 (the "2009 MOU"), CMC and the Monroe County Sheriff's office agreed that CMC could staff a position that is temporarily vacant with a person who "holds a license equal to (or greater than) that held by the person that he or she is temporarily replacing. All exchanges are hour for hour...." For example, a physician could substitute for a nurse practitioner, and a nurse practitioner could substitute for a registered nurse.[18]

**Staffing at Monroe County Jail/Facility**

24. The Monroe Jail/Facility did not have the number of health professionals required by its contract with CMC. The understaffing notably included high-level clinicians like physicians, nurse practitioners/physician assistants, psychiatric nurse practitioners/psychiatric physician assistants, and mental health director.

25. CMC failed to meet contract requirements for professional staff over certain periods:

    a. from February 20, 2011 through April 30, 2011, understaffing for the social worker/counselor position amounted to an average bi-weekly deficit of 51 hours;

    b. from April 17, 2011 through January 7, 2012, understaffing for the psychiatric registered nurse position amounted to an average bi-weekly deficit of 146 hours; and

---

[18] A nurse practitioner is a registered nurse who has an advanced education and clinical training in a healthcare specialty area. Nurse practitioners perform physical examinations, diagnose and treat health problems, order, conduct and interpret diagnostic tests and prescribe medications.

      c.  in the bi-weekly payroll period of March 31, 2013 to April 13, 2013, both the physician and medical director positions were understaffed by 23.75 hours resulting in a 30% reduction in medical oversight.

26.     Pursuant to the Monroe County contract, CMC must pay for a Contract Monitor who is responsible for determining whether or not CMC met its staffing and services obligations under the contract. The Contract Monitor is authorized to enforce the contractual penalty provisions for any staffing shortages. Liquidated damages at one and a half times the providers' hourly salary plus a 20% administrative fee are to be applied if a physician, nursing, midlevel provider, psychiatrist or dentist does not meet specified hours of service in any given week. The Contract Monitor's audit oversight was limited to staff attendance records, medication administration records, and medical records with respect to medical screenings following intake.

27.     Overall, the Contract Monitor determined that, in the period covering January 9, 2011 through June 22, 2013 ("Audit Period"), CMC owed the county in excess of $390,000 due to staffing shortages after downward adjustments and offsets for certain overages in staffing hours. However, such downward adjustments typically included the substitution of the social worker/counselor staff overages for that of the psychiatric registered nurse shortages. Such staffing substitutions were in violation of the 2009 MOU because the social worker/counselor license is not equal to or greater than that of the psychiatric nurse practitioner. See supra at paragraph 23.[20]

---

[20] While social workers and psychiatric registered nurses provide mental health services, psychiatric registered nurses also engage in the physical care of patients, e.g., monitoring vital signs, administering medications and monitoring the results of treatment.

28.     In addition to the downward adjustments and offsets for certain staffing overages and shortages that occurred in the Audit Period, penalties were further reduced from approximately $390,000 to $340,017.98 as a result of negotiations between CMC and the Contract Monitor.

29.     While the monthly contract invoices are handled and paid by the Office of the Monroe County Executive, these monthly invoices do not reflect credits for staffing shortage penalties as required under the contract. See supra at paragraph 18. Instead, such penalties are paid directly to the office of the Monroe County Sheriff.

30.     The Contract Monitor conducted monthly reviews of inmate medical records and medication administration records during the Audit Period. The Contract Monitor noted that deficiencies in the provision of services were typically attributed to the "continuing" turnover and hiring of staff.[21]

**Credentialing of Staff**

31.     CMC's credentialing process was inadequate for the Monroe Jail/Facility. Several professional staff members were hired without appropriate licenses and experience and one was hired despite a prior felony conviction. For example, CMC employed a registered nurse who on or about August 19, 2005, having altered a duly authorized prescription by increasing the quantity of the drug, was convicted of forgery in the 2nd degree, a Class D Felony.[22]

---

[21] For example, the Contract Monitor documented in the June 20-21, 2013 medical audit report that (based on a random sample of 200 charts) 16% of inmates did not have a physical completed within 14 days of being booked and vital signs were not recorded for 22% of inmates on intake.

[22] This registered nurse worked at the Monroe County Jail/Facility from October 28, 2009 to July 29, 2011. On September 15, 2009, the New York State Board of Regents stayed the suspension of her license for two years (September 30, 2009-September 29, 2011) and placed her on probation. After failing to meet

32.     Staff members were hired and worked at the Monroe Jail/Facility as either a licensed practical nurse or a registered nurse for a period of weeks prior to being licensed.

33.     Additionally, a number of the nursing staff had little to no professional nursing experience at the time they were hired to work at the Monroe Jail/Facility.

### Tioga County: Contract with CMC

34.     Tioga County entered into contract with CMC for the provision of health services at the Tioga County Jail in 2008, following a discretionary and non-competitive procurement process by which Tioga County reportedly placed a newspaper advertisement for correctional health services and CMC was the sole bidder.

35.     Tioga County, through its Sheriff's office, entered into a one-year contract with CMC on January 1, 2008, and has renewed the contract each year on an annual basis until 2012 when, notwithstanding the State Medical Review Board's investigation and report documenting a host of contractual failures and inadequacies, including an inmate suicide deemed avoidable, Tioga County nonetheless extended the contract for a three-year period ending December 2015.

36.     The annual CMC contract price is based on an average daily inmate population of 100 at the Tioga jail.  The contract also allows for nominal per inmate increases for census above 100.

37.     The initial base contract price for the January 1, 2008 - December 31, 2008 term was $193,434 and required the following staff for the jail:

           a.     1 Medical Director/Physician: 4 hours per week on-site,

the terms of her probation she subsequently surrendered her registered nurse license, effective September 26, 2012.

11

24/7 on call;

b.       1 Registered Nurse ("RN") who served also as Health Service Administrator: 40 hours per week (Monday - Friday/day shift);

c.       1 RN: 8 hours per week (Saturday); and

d.       1 Dentist: on call 24 hours.

38.       In 2012, Tioga County, through its Sheriff's office, signed a three-year contract extension with CMC, effective January 1, 2013 through December 31, 2015. Each year, CMC has increased its contract price from $193,434 in 2008 (the first contract) to $331,116 in 2013, almost double the initial 2008 contract price. The new CMC three-year contract is scheduled to increase by 3.5% annually in 2014 and 2015.

39.       Over five years, CMC has increased staffing, adding: (i) in 2009, a full-time (40 hours/week) Director of Forensic Mental Health,[23] whose yearly salary totaled $48,000; (ii) in August 2012, a psychiatrist to be on-site two hours per week and on call 24/7; and (iii) in 2013, increased coverage by the Medical Director/Physician from four to eight hours per week.[24]

40.       To bill for payment, CMC has sent a monthly invoice to Tioga County that is one-twelfth the annual contract price, which Tioga County pays accordingly. Under its contract, CMC does not provide Tioga County any kind of backup documentation to evidence services provided (salaries and expenses) when it submits its

---

[23] As noted in paragraph 7 supra, the Director of Forensic Mental Health was hired to conduct mental health assessments of inmates. Such duties required that the Director Forensic Mental be licensed and she was not.

[24] See CMC's Letter to New York State Comm'n of Corr., Medical Review Board, Re: Fredrick Haag, dated October 17, 2012 (setting forth CMC's corrective action plan following an inmate's suicide). See also paragraph 7 supra.

monthly invoice.

**Staffing at Tioga County Jail**

41.     CMC's documentation of staff hours at the Tioga County Jail was often missing or evidenced that CMC substituted less qualified staff than the contract required. For example, while the CMC physician was paid for his time, for at least a year and a half, CMC could not show any documentation that he worked the hours for which he was paid.

42.     Where there *was* evidence of documentation for the hours worked by the CMC physician, psychiatrist and dentist, the documentation was unreliable: timesheets were undated and signed by a proxy (i.e., a nurse manager) and not by the medical professionals themselves.[25]

43.     What is more, CMC substituted less qualified staff for the required level of qualification required by the contract. For example, at the commencement of the first Tioga contract in 2008, CMC substituted the contractually required on-site *physician* coverage with the services of a *physician assistant*. Not only was the contract not amended to allow for this change, there was no downward pricing of the contract to reflect the shift to a far lower-cost mid-level practitioner.

44.     In 2013, the new physician worked on-site approximately two hours per week and the physician assistant worked in the place of the physician approximately four hours per week. However, even when the physician assistant's hours are counted as on-site physician coverage, physician coverage remained deficient by two hours per week

---

[25] Numerous timesheets were also missing for the physician assistant and nursing staff. As a direct result of OAG's questioning about the missing timesheets, CMC provided payroll records that indicated staff were paid for the time periods in which timesheets were not available.

over the course of 2013.

45.     CMC employed, for 20 months -- almost two years -- a full-time Director of Forensic Mental Health (see paragraph 39 supra) who was illegally engaged in the duties of a social worker without a social worker license.  It was only after the State Board of Medicine's investigation of an inmate's suicide and finding that the Director of Forensic Mental Health did not appropriately refer the inmate to the psychiatrist and was not properly licensed, that CMC stopped using her in this capacity. But instead of terminating the staff member for her lack of proper license, in August 2012, CMC bifurcated the duties of the Director of Forensic Mental Health, gave her a new part-time (20 hours per week) position of "Case Manager," and hired a licensed medical social worker to work only part-time, 20 hours per week, to handle matters requiring a social worker's license.

46.     The 2013 contract extension that Tioga County executed in December 2012 does not reflect that the duties of the Director of Forensic Mental Health, see paragraph 39 supra, were significantly changed, nor did CMC decrease the contract price to reflect that the duties of the full-time Director of Forensic Mental Health position would be divided between a part-time licensed medical social worker and a part-time Case Manager.

47.     As noted in paragraph 37 supra, the contract initially required CMC to provide four hours per week of *on-site* medical director/physician coverage in each of the years 2008 through 2012. After the inmate's death, the revised contract for 2013 requires CMC to increase the on-site medical director/physician coverage to eight hours per week. See paragraph 39 supra.

48.     In 2010, CMC retained the services of a licensed physician who largely provided off-site supervision of the physician assistant in his private office and made on-call visits when nursing or jail staff requested he come to the jail to examine an inmate or review a chart.

49.     CMC could produce no records to evidence that the physician provided the contractually required oversight for services rendered by the nurses or the Director of Forensic Mental Health.

**The State Medical Review Board's Call for
an Independent Monitor in Tioga County**

50.     The Tioga County Sheriff's office did not follow the State Medical Review Board's recommendation that it hire an independent monitor to assess CMC's adherence to its contract obligations.[26] Instead, the Tioga County Sheriff allowed CMC to put into place an internal monitoring plan that limited itself to medical record audits conducted every six months by CMC's Corporate Medical Director and a physician assistant. The self-monitoring plan neither includes monitoring by a psychiatrist nor assessment of CMC's adherence to its contract obligations, overall.

---

[26]See paragraph 8 supra.

## Legal Conclusions

51.     The OAG finds that CMC, a for-profit business corporation that provides medical care to inmates violates New York's prohibition of the corporate practice of medicine.  [BCL § 1503; PL § 2 & 8-B; and Educ. L § 6512]

52.     CMC has failed to provide proper medical oversight to Tioga County's jail population as evidenced by its failure to provide (i) on-site physician coverage as required under its contract with Tioga jail in the years 2008 to 2012, and (ii) the requisite number of hours of on-site physician coverage (fewer than eight hours of on-site physician service were provided over the course of a year) in 2013.  Such failure to provide the contracted medical director/physician service constitutes a deceptive business practice in violation of law. [EL § 63-c, GBL § 349, and NY False Claims Act §§ 189 (1)(a) and (b) and 3]

53.     For 20 months (from November 2010 until August 2012), CMC employed an unlicensed Director of Forensic Medicine who performed the duties of a licensed social medical social worker at the Tioga Jail in violation of law.  [Educ. L., Article 154, § 7700 *et seq*. EL § 63-c, GBL § 349, and NY False Claims Act §§ 189 (1)(a) and (b) and 3].

54.     CMC substituted the services of a physician assistant at the Tioga County Jail to provide medical services without decreasing the price of the contract. Such substitution of a mid-level practitioner in the place of a physician without an appropriate downward adjustment in the contract price is a deceptive business practice in violation of law. [EL § 63-c, GBL § 349 and and NY False Claims Act §§ 189 (1)(a) and (b)]

55.     CMC failed to maintain complete and accurate time records of its Tioga jail staff. [EL § 63-c and GBL § 349]

56.     CMC failed to: (i) employ nursing personnel with the requisite experience as required under its contract with Monroe County; and (ii) maintain adequate staffing at the Monroe Jail/Facility. [EL § 63-c and GBL § 349]]

57.     **WHEREAS**, CMC admits to paragraphs 1-5, 32-33, 43-45, 51 and 53 and neither admits or denies the OAG's Findings 12 –31, 34-42, 46-50. 52 and 54-56 above;

**WHEREAS**, the OAG is willing to accept the terms of this Assurance pursuant to EL § 63(15) and to discontinue its investigation; and

**WHEREAS**, the parties each believe that the obligations imposed by this Assurance are prudent and appropriate;

**IT IS HEREBY UNDERSTOOD AND AGREED**, by and between the parties that:

### III. <u>PROSPECTIVE RELIEF</u>

**Restructured Business Operations**

58.     Within ninety days of the Effective Date of this Assurance (Effective Date is defined <u>infra</u> at paragraph 87), CMC will restructure its New York State business operations and contracts such that its functions are limited solely to administrative support of medical services in New York State jails and correctional facilities. Such restructuring of business operations and contracts shall be subject to the approval of the OAG and SED. Any county that does not choose to continue with CMC at the time of termination of the current contract may discontinue its contract with no penalty to the

county.

59.     Under its restructured management services contract with any county in the State of the New York and any newly formed medical and dental professional corporations ("Professional Corporations"), the contract shall require that: (a) all payments be invoiced on a monthly basis showing costs incurred by CMC and the Professional Corporations for services during the previous month, and(b) CMC or the Professional Corporations pay restitution for staffing shortages plus a penalty if a physician, nurse, nurse practitioner, physician assistant, psychiatrist or dentist does not meet specified hours of service in any given week and $500 for each non-performance related to improper staff credentials, failure to screen and conduct physical exams, and failure to provide necessary care (see Exhibit A, paragraphs I, III, and IV).  CMC shall provide the OAG with copies of all new and amended contracts with the Professional Corporations and the New York Counties.

60.     CMC shall structure all future contracts with New York counties in accordance with paragraphs 58 - 9 supra.

61.     CMC shall conduct its business in adherence to its contracts with each county, all applicable federal and state laws (including New York State Medical Review Board regulations) and the standards promulgated by the National Commission on Correctional Health Care and in accordance with this Assurance.

**Independent Monitor**

62.     Within thirty days of the Effective Date, and for a period of three years from the Effective Date, CMC shall engage and pay for the services of Public Health Solutions who will serve as the independent monitor ("Monitor") to assess CMC's

compliance with all of its contracts with New York State Counties, all applicable federal and state laws (including New York State Medical Review Board regulations) and the standards promulgated by the National Commission on Correctional Health Care. Except as noted _infra_ at paragraph 63, the Monitor's cost shall be capped at $200,000 per annum for each of the first two years plus reasonable travel expenses at governmental rates and $125,000 for the third year plus reasonable travel expenses at governmental rates. The third year payment cap of $125,000 will be increased to $200,000 if Monitor's twelve-month audit finds substantial non-compliance with this Assurance.

63.     Within sixty days of the Effective Date of this Assurance, CMC will undergo an initial assessment by the Monitor as set forth _supra_ at paragraph 62 that will include a retrospective audit covering the four-month period prior to the Effective Date ("Initial Audit"). If in any New York county where CMC has a contract to provide health services, the Initial Audit reveals any of the occurrences listed on Exhibit A "Retrospective Audit Triggers and Penalties," attached hereto, the Monitor will conduct a three-year retrospective audit of CMC's services and invoicing in that county. CMC shall pay: (i) penalties as set forth on Exhibit A; and (ii) the full cost of any retrospective audit which cost shall not be counted in the Monitor's $200,000 cap. See _supra_ at paragraph 62.

64.     Following the Initial Audit, CMC shall at twelve months, and again at twenty-four months, from the Effective Date of this Assurance, undergo an audit by the Monitor to ensure compliance with its contracts including, but not limited to, adherence to statutory requirements the standards promulgated by the National Commission on Correctional Health Care and this Assurance. CMC or the Professional Corporations

shall pay restitution and penalties, as set forth supra at paragraph 59, if the Monitor finds that obligations hereunder are not met.

65.    CMC shall facilitate the Monitor's on-site access to the following (as well as provide upon request digital copies of documents and records): all medical records; employee files (including, if applicable, copies of current licenses, proof of certification, evaluations, job description, DEA numbers and malpractice insurance); staff salary information, time and payment records; all county contracts, including exhibits, attachments, schedules and amendments and county policies relating to the delivery of health services in jails/facilities; all contracts with Professional Corporations, including exhibits, attachments, schedules and amendments; invoices to counties; payments to counties; all protocols, policies and procedures relating to the delivery of health services; drug formulary and pharmacy procedures, including staffing, dispensing practices, invoices, usage records and accessing non-formulary drugs; quality assurance program reviews (including meeting agenda, attendance, minutes and corrective action plans); staff orientation and training programs (including staff attendance records); inmate sick call processes and grievances (including documents that reflect how such sick calls and grievances were handled and resolved); all reports and records documenting urgent and serious inmate incidents and illnesses and related transfers to outside medical facilities; discharge to community health plans; staff/consultants; and all other information and documents that the Monitor deems necessary.

66.    The Monitor may be extended for one year period(s) if CMC is not in substantial compliance with this Assurance. In the event that the monitoring period is extended, the Monitor's annual fee will be re-assessed.

## IV. <u>REPORTS TO OAG</u>

67.     Upon completion of each of the audits described <u>supra</u> at paragraphs 63-64, the Monitor shall prepare and furnish a report to the OAG and CMC on CMC's compliance with this Assurance, and its contracts with the NY Counties, as well as with all applicable federal and state laws (including New York State Medical Review Board regulations) and the standards promulgated by National Commission on Correctional Health Care. The Monitor shall provide recommended corrective actions where the Monitor has found non-compliance.

68.     The Monitor shall be required to file its report and recommendations with the OAG and CMC within 30 business days of completing each of the audits set forth <u>supra</u> at paragraphs 63 - 64.

## V. <u>RESTITUTION</u>

69.     Within thirty days of the Effective Date of this Assurance, CMC shall pay restitution to Tioga County in the amount of $100,000.

## VI. <u>PENALTIES</u>

70.     Within thirty days of the Effective Date of this Assurance, CMC shall pay $100,000 to the OAG as a civil penalty. Such sum shall be payable by check to "State of New York Department of Law."

## VII. **MISCELLANEOUS**

71.     OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by CMC and its counsel and OAG's own factual investigation as set forth in Findings (12) - (56) above.  To the extent that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

72.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by CMC in agreeing to this Assurance.

73.     Notwithstanding any provision of this Assurance to the contrary, the OAG may, in its sole discretion, grant written extensions of time for CMC to comply with any provision of this Assurance.

74.     CMC represents and warrants, through the signatures below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized.  CMC shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis.  Nothing in this paragraph affects CMC's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which OAG is not a party.  This Assurance is not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by CMC.

75.     This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

76.     This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG.

77.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

78.     To the extent not already provided under this Assurance, CMC shall, upon request by OAG, provide all documentation and information necessary for OAG to verify compliance with this Assurance.  All notices, reports, requests, and other communications to any party pursuant to this Assurance must reference "**AOD # 13-495,**" shall be in writing and shall be directed as follows:

> If to CMC to:      Correctional Medical Care, Inc.
>                    920 Harvest Drive, Suite 120
>                    Blue Bell, Pennsylvania 19422
>
> If to the OAG to:  Dorothea Caldwell-Brown, Assistant Attorney General
>                    Office of the Attorney General
>                    Health Care Bureau
>                    120 Broadway, New York, New York 10271

79.     Acceptance of this Assurance by the OAG shall not be deemed approval by the OAG of any of the practices or procedures referenced herein, and CMC shall make no representation to the contrary.

80.     Pursuant to EL § 63(15), evidence of a violation of this Assurance shall constitute *prima facie* proof of violation of the applicable law in any action or proceeding thereafter commenced by the OAG.

81.     CMC agrees not to raise or interpose in any way any jurisdictional objection as a defense to any cause of action, claim or argument arising from the OAG's enforcement of this Assurance, and consents to the jurisdiction of the courts of New York State [New York County], for the purpose of interpreting, carrying out the terms of this Assurance and/or granting such other and further relief as may be necessary for its enforcement.

82.     If the Assurance is voided or breached, the Company agrees that any statute of limitations or other time-related defenses applicable to the subject of the Assurance and any claims arising from or relating thereto brought by the OAG are tolled from and after the date of this Assurance.  In the event the Assurance is voided or breached, CMC expressly agrees and acknowledges that this Assurance shall in no way bar or otherwise preclude OAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Assurance, against CMC, or from using in any way any statements, documents or other materials produced or provided by CMC prior to or after the date of this Assurance.

83.     If a court of competent jurisdiction determines that CMC has breached this Assurance, CMC shall pay to the OAG the cost, if any, of such determination and of enforcing this Assurance, including without limitation reasonable legal fees, expenses, and court costs.

84.     The OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest.  The OAG is willing to accept this Assurance pursuant to EL § 63(15), in lieu of commencing a statutory proceeding. This Assurance shall be governed by the laws of the State of New York without regard to any conflict of

laws principles.

85.      Nothing contained herein shall limit the ability of the counties that are, or have been, under contract with CMC to: (i) investigate or take action with respect to any contractual non-compliance by CMC; or (ii) exercise any other rights under law. However, to the extent CMC has paid damages to a county in accordance with this Assurance, the payments shall offset such county's claim for additional damages arising under the same set of facts and circumstances.

86.      Nothing herein shall be construed as to deprive any person of any private right under the law.

87.      This Assurance shall be effective on the date that it is signed by an authorized representative of the OAG ("Effective Date").

88.      Any failure by the OAG to enforce this entire Assurance or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of the OAG's right to enforce other deadlines and provisions of this Assurance.

.

**IN WITNESS THEREOF,** the undersigned subscribe their names:

Dated:   New York, New York
                          , 2014

**CORRECTIONAL MEDICAL CARE, INC.**

By: _____  ]
    Maria Carpio

By: _____
    Emre Umar
    President

Dated:   New York, New York
September   22, 2014

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

LISA LANDAU
Health Care Bureau Chief

By: _____
    DOROTHEA CALDWELL-BROWN
    Assistant Attorney General
    Health Care Bureau

# EXHIBIT A

## RETROSPECTIVE AUDIT TRIGGERS & PENALTIES

### Sampling shall be based on generally accepted auditing standards

**I.**    **Improper Staff Credentials**
To the extent that an employee does not have the requisite credential(s) for the position held, CMC shall pay restitution or issue a credit to the County for the cost of employing the improperly credentialed personnel.

**II.**    **Staff Shortage**
To the extent that CMC has materially failed to provide staffing at a facility, CMC shall pay liquidated damages in accordance with CMC's contract with the County. If no liquidated damages provision in the contract with the County, CMC shall pay restitution or issue a credit to the County where the County has overpaid. For purposes of this provision, "materially failed" and "material failure" means with respect to any:

   a. Licensed staffing position - less than 80% of required hours for that position for any given work shift in any month; and

   b. Unlicensed staffing position - less than 60% of required hours for that position for any given work shift in any month.

Unless otherwise provided by contract with a county, in calculating the above percentages, hours worked: (i) by a physician above any contractually-required amounts may be counted towards hours that are required for a physician's assistant or nurse practitioner; (ii) by a nurse practitioner above any contractually required amounts may be counted towards hours that are required for a nurse; (iii) by a registered nurse above any contractually required amounts may be counted towards hours that are required of a licensed practical nurse; (iv) by a licensed psychiatrist above any contractually required amounts may be counted towards hours that are required of a psychiatric nurse; (v) by a registered nurse or a licensed practical nurse above any contractually required amounts may be counted towards hours that are required of a dental assistant; and (vi) by a by a registered nurse or a licensed practical nurse above any contractually required amounts may be counted towards hours that are required of an administrative assistant.

**III.**    **Failure to Screen & Conduct Physical Exams**
To the extent that at any facility, CMC materially fails to conduct initial screens within 72 hours of booking and physical exams within twenty one days of admission, CMC shall pay to the County a penalty of $500 for each delayed: (1) initial screen; and (2) physical exam.

## IV. Lack of Access to Medical Care

To the extent that CMC materially fails to comply with its contractual obligations to provide inmates with necessary medical, obstetrical, psychiatric, dental and emergency care, including medications in a timely manner, CMC shall pay to the County operating that facility a penalty of $500 for each failure. With respect to medications, "materially fails" shall mean:

a. For high-risk medications (those drugs that are ordered "stat" or those for which interruptions in dosing schedule would result in an adverse event, e.g., HIV anti-virals, anti-psychotics, anti-seizure, diabetic agents, anti-hypertensive agents, etc.), failure to provide an inmate with medications (or an appropriate substitute), within 24 hours of ordering.

b. For other than high-risk medications – failure to provide an inmate with medications within 48 hours of ordering.

# EXHIBIT C



Attorney General
Eric T. Schneiderman

## A.G. Schneiderman Announces Settlement With Health Care Company That Provided Substandard Service To Jail Inmates In 13 NY Counties

*AG Investigation Finds Pennsylvania-Based Correctional Medical Care, Inc. Provided Poor Medical Care; Settlement Agreement Requires Independent Monitor To Oversee Services*

*Schneiderman: We Will Continue To Take Action Against Businesses That Abuse The Public Trust*

NEW YORK – Attorney General Eric T. Schneiderman today announced an agreement between New York State and Correctional Medical Care, Inc. (CMC), a Pennsylvania-based, for-profit prison health care contractor that provides medical services in jails in 13 upstate counties. The agreement comes on the heels of an investigation by the Attorney General's office that found CMC, which holds over $32 million in contracts with the New York counties, violated key provisions of its contracts with two of the counties, Monroe and Tioga. CMC understaffed facilities and shifted work hours from physicians and dentists to less qualified and lower-wage staff, including, in one case, a nurse with a felony conviction. The settlement agreement requires that an independent monitor oversee that CMC meets its obligations to provide medical care in jails in all the counties where CMC is contracted to with for a period of three years, and requires the company to pay restitution and penalties.

"Tax dollars meant to cover medical care of our county prisoners must not be wasted-- and substandard care and mismanagement are not an option," **Attorney General Schneiderman** said. "Shortchanging medical services provided to jail populations can lead to direct harm to individuals and misses a public health opportunity to provide care to individuals who often have undiagnosed, untreated medical needs. We will bring to justice contractors who line their pockets while failing to uphold their obligations to the people of New York."

**New York State Assembly Health Committee Chairman Richard N. Gottfried** said, "This is a clear example of the dangers of business corporations providing health care. Attorney General Schneiderman has won an important victory that matters not only to jail inmates but to all New Yorkers."

**Commissioner Phyllis Harrison-Ross, M.D., chair of the Commission's Medical Review Board,** said, "The Commission of Correction and its Medical Review Board have consistently raised serious concerns about the medical care provided by Correctional Medical Care and has documented those concerns in reports issued a result of its investigations into deaths at CMC-served facilities. Incarceration should not prevent an individual from receiving competent care and all medical care providers in New York must conform to the state's laws, rules and regulations governing medical care delivery. The Commission will continue to monitor CMC, other private health care providers and locally-provided jail health services to ensure a standard of quality care."

**New York State Education Commissioner John B. King, Jr.** said, "Every tax dollar must be spent the right way to provide the best services. When unqualified personnel make important medical decisions, public safety is compromised and tax dollars are wasted. Attorney General Schneiderman's investigation will make sure qualified medical personnel are on the job, providing the appropriate medical services and protecting the public health and safety."

The Attorney General's investigation of CMC began as a result of a referral from the New York State Commission of Correction and the New York State Education Department. The Commission of Correction found significant lapses in medical care provided to six prisoners who died in custody between 2009 and 2012 at five county jails contracted with CMC. The board also found that medical records lacked evidence of physician or psychiatrist oversight and did not include required information. In addition, CMC staff dispensed medications without

New York City Press Office: (212) 416-8060

Albany Press Office: (518) 776-2427

**nyag.pressoffice@ag.ny.gov**

    

**A.G. Schneiderman & The Robin Hood Foundation Announce Program To Help Homeless Families Obtain Permanent Affordable Housing**

**A.G. Schneiderman & Commissioner Bratton Arrest Reputed Gang Members Accused Of Operating A Violent Gun Trafficking Ring**

### Press Releases

> 2015

> January
> February
> March
> April

> 2014

> January
> February
> March
> April
> May
> June
> July

medical orders.

An ensuing investigation by the Office of the Attorney General found that CMC was understaffing facilities and shifting work hours from physicians and dentists to less qualified and lower-wage staff. CMC also hired several unlicensed and inexperienced staff members, including one nurse with a felony conviction. Despite CMC's contract violations, it continued to charge New York counties more for its services. Its contract with Tioga County nearly doubled, to approximately $331,000 in 2013, from about $193,000 in 2008.

Quality correctional health services are critical to inmate safety and health, and to safeguard the health of communities that inmates return to. Medical services provided at jails and prison also offer a chance to track -- and forestall -- the spread of infectious disease and to stop chronic health problems faced by inmates from becoming debilitating conditions.

**Soffiyah Elijah, executive director of the Correctional Association of New York,** said, "Given the extensive health needs of people incarcerated in New York county jails, it is crucial for them to receive quality medical and mental health services. This would be in the best interests of overall public health. We commend the Attorney General, the State Commission of Correction and the Education Department for working together to identify, make public and hold CMC accountable for the improper care being provided to its patients."

Attorney General Schneiderman's investigation also found that CMC violated New York's prohibition of the corporate practice of medicine, which bars corporations from practicing medicine or employing physicians to provide medical services. The law aims to ensure that a licensed medical provider is ultimately responsible for health care and that profits never override sound medical opinion. CMC's owner is not a licensed medical provider – nor is the owner's husband, who is an officer of the company.

The agreement provides for the restructuring of CMC contracts, oversight of CMC by the independent monitor, restitution to Tioga County, and civil penalties. Monroe County has already received restitution for staffing shortages in January 2011 through June 2013, totaling $340,017. Tioga is receiving restitution for CMC's failure to meet its contractual obligation to hire a licensed social worker from 2009 to 2012. Provisions include:

> CMC will pay for an independent monitor for a period of three years to ensure compliance with its contracts.
> CMC will submit all 13 county contracts to an initial audit and then annual audits by the independent monitor.
> CMC will pay $100,000 in restitution to Tioga County and $100,000 in civil penalties to New York State.
> CMC will provide only administrative services to bring operations into compliance with New York law prohibiting the corporate practice of medicine, and will create a separate professional medical corporation to provide medical care.

The agreement does not prohibit Tioga, Monroe or any other county from seeking additional restitution from CMC.

The case was investigated by Assistant Attorney General Dorothea Caldwell-Brown of the Attorney General's Health Care Bureau, which is led by Bureau Chief Lisa Landau. Executive Deputy Attorney General for Social Justice is Alvin Bragg.

> August
> September
> October
> November
> December

## Archived

> 2013
> 2012
> 2011
> 2010
> 2009
> 2008
> 2007
> 2006
> 2005
> 2004
> 2003
> 2002
> 2001
> 2000
> 1999
> 1998

Search

# EXHIBIT D

_____

WILLIAM HOWELL,                                      :
                                                     :
        Plaintiff,                              :
                                                     :
   v.                                            :
                                                     :
MONROE COUNTY, PATRICK O'FLYNN,                      :
RON HARLING, CORRECTIONAL MEDICAL                    :
CARE, INC., EMRE UMAR, MARIA CARPIO                  :
CHRISTINE ROSS, ANSELMO DEASIS, M.D.,                :
SHAHID ALI, N.P., BETSY TELLER, P.A.,                :
JOHN/JANE DOES 1-3, Employees of                     :
Correctional Medical Care, Inc.,                     :
whose identities cannot presently be determined,     :
                                                     :
        Defendants.                             :

_____

### CERTIFICATE OF MERIT REGARDING MEDICAL MALPRACTICE CLAIMS

    **Elmer Robert Keach, III,** attorney for the Plaintiff, declares that:  I have reviewed the

facts of this case with a physician who is licensed to practice medicine in, at a minimum, the State

of New York who I reasonably believe is knowledgeable in the relevant issues involved in this

action, and I have concluded on the basis of such review and consultation that there is a reasonable

basis for the commencement of this action regarding medical malpractice against the State of New

York.

                                 Respectfully Submitted By:

                                 /s Elmer Robert Keach, III

Dated: February 26, 2016                _____
                                 Elmer Robert Keach, III, Esquire
                                 LAW OFFICES OF ELMER ROBERT
                                   KEACH, III, PC
                                 One Pine West Plaza, Suite 109

Albany, NY 12205
Telephone: 518.434.1718
Telecopier: 518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com